Filed 7/30/26  In re W.L. CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re W.L., a Person Coming Under the Juvenile Court Law. | H053832 (Santa Clara County Super. Ct. No. 24JD028283) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Respondent, v. K.L., Appellant. | |

This is the second appeal by K.L. (Mother) arising from juvenile dependency proceedings involving her daughter, W.L., a five-year-old with special needs.  In the first appeal, Mother challenged the juvenile court's disposition removing W.L. from her care.  We affirmed.  (*In re W.L.* (Dec. 15, 2025, H053170) [nonpub. opn.].)  Mother now appeals the orders entered at the six-month review hearing.  She argues that the juvenile court erred in finding a substantial risk of detriment if W.L. were returned to her care with family maintenance services; in addition, she argues that the Santa Clara County Department of Family and Children's Services (Department) failed to provide reasonable reunification services by refusing to "step down" supervised visitation to unsupervised visitation.  We are not persuaded by these arguments and will affirm.

# I.    BACKGROUND

## A.    *Prior Appeal*

For context, we briefly summarize the relevant facts and history from the proceedings addressed in our prior opinion.[1]

This matter came to the Department's attention in November 2024, when law enforcement placed Mother on an involuntary psychiatric hold under Welfare and Institutions Code section 5150 and took W.L., then three years old, into protective custody.[2]  Officers had responded to multiple reports that Mother was behaving erratically at a retail store late at night and appeared to be either under the influence or experiencing a mental health crisis.  Several witnesses reported that Mother had caused W.L. to fall out of her stroller twice, shoved W.L. into the car, and drove off at high speeds, swerving off the road and passing through stop signs with W.L. unsecured in the car.  Officers observed that Mother appeared "[s]uper manic," disheveled, and had difficulty speaking in coherent sentences; W.L. displayed visible signs of neglect, including malnourishment.  Mother later admitted to using methamphetamine that day, after driving for almost a week with W.L. from Oklahoma to California.

An initial evaluation of W.L. diagnosed her with "failure to thrive" and found that she was physically underdeveloped for her age, had "dental disease associated with drinking bottles of milk well beyond the first year of life," and exhibited "pervasive developmental delay, including cognitive, speech, and motor delays."  The evaluation concluded that W.L. "has experienced profound neglect, including supervisory and medical neglect, beyond standards in our community."

---

[1] W.L.'s father is not a party to this appeal, and the findings pertaining to him are not at issue.  Accordingly, we recite only the information relevant to the juvenile court's findings and orders for Mother.

[2] All undesignated statutory references herein are to the Welfare and Institutions Code.

In December 2024, the Department filed a petition under section 300, subdivision (b), alleging that W.L. had suffered, or was at substantial risk of suffering, serious physical harm or illness because of Mother's inability to provide care as a result of mental illness or substance abuse. Mother initially delayed the dependency proceedings by objecting to her court-appointed attorney, initiating a paternity action in Oklahoma, and seeking to have the dependency matter heard there. Mother was also uncooperative with the Department, did not participate in her case plan, failed to provide medical releases for W.L., minimized W.L.'s conditions, and discussed the dependency proceedings with W.L. during her supervised visits despite repeated warnings from visitation supervisors to refrain from doing so.

After resolving the question of jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act, the juvenile court held a contested jurisdiction and disposition hearing in March 2025, where Mother continued to deny responsibility and downplay the severity of W.L.'s condition. The court noted numerous concerns regarding W.L.'s physical and developmental delays, and it found that Mother lacked sufficient understanding of, and accountability for, those issues. The court ultimately found sufficient evidence to support the allegations in the petition, declared W.L. a dependent, removed her from Mother's care, ordered reunification services, and ordered supervised visitation, with the Department having the discretion to increase the frequency and duration of visits.

Mother appealed, arguing that the removal order was not supported by the evidence and violated her constitutional rights. This court found these arguments to be unavailing, holding that the record contained substantial evidence of W.L.'s "profound neglect" while in Mother's care, Mother's repeated noncompliance, and her continued failure to acknowledge the risk she posed to W.L. This court affirmed the juvenile court's orders.

3

***B.     The Six-Month Review and Contested Hearing***

In September 2025, while Mother's prior appeal was still pending, the juvenile court held a six-month review hearing under section 366.21, subdivision (e).  Mother opposed the Department's recommendation to continue family reunification services and not return W.L. to her care with family maintenance services, and so the matter was set for a contested hearing the following month.

At the contested hearing, the court received the Department's reports and heard testimony from Mother, her therapist, and the social worker.  Minor's counsel agreed with the Department's recommendations and expressed the concern that "[W.L.] requires a high level of care[,] and [Mother] still has a lot of work to do … to gain permanent stabilization."  By contrast, Mother argued that the Department had not met its burden of showing detriment to W.L. if she were returned to Mother's care, and also the Department had failed to provide reasonable reunification services by limiting Mother to supervised visits.  Alternatively, Mother requested that the court exercise its discretion to order unsupervised visitation.

By the time of the hearing, W.L. had been diagnosed with autism spectrum disorder and required additional services, including behavioral therapy, physical therapy, and an assessment for therapeutic counseling.  Since her removal, it was also reported that W.L. had made significant progress: she had gained weight, was eating well, was potty-trained, and had enrolled in a child care center that could support her developmental and academic needs.  Mother acknowledged that W.L. had been malnourished and had had a speech delay while in her care, and that she (Mother) should have sought and prioritized medical care for W.L.  The social worker reported that although W.L. appeared "a bit dysregulated" after her visits with Mother, the supervised visits were going well in the structured environment provided by the Department.  The Department had also moved Mother's visits from a closely observed area to a less restrictive location, allowing Mother "more free range with [W.L.]."

The evidence showed that, in contrast to her actions prior to the jurisdiction and disposition hearing, Mother was actively participating in her case plan, making use of the services and referrals provided by the Department and attending most of W.L.'s medical appointments, although Mother cancelled and "no-showed" a number of appointments related to W.L.'s therapeutic assessment. Mother completed parenting classes, underwent a psychological evaluation, engaged in weekly individual therapy, and attended monthly appointments with a psychiatrist to manage her medications for anxiety, including benzodiazepine. She also participated in random drug testing, although she missed four tests and had two positive tests for alcohol; Mother initially attributed those results to using mouthwash and brushing her teeth before testing.

Mother was diagnosed by her psychiatrist, Dr. William Yang, with generalized anxiety disorder, and she also reported prior diagnoses of depression, anxiety, and post-traumatic stress disorder. Her psychological evaluation, conducted by Dr. Anh D. Weber, noted that although she had a history of higher education and above-average cognitive abilities, her mental health challenges impaired her judgment, insight, and ability to provide W.L. with appropriate and stable care. Mother's symptoms appeared to be "poorly managed," she showed "limited insight into the impact of her mental health on her parenting" ability. Mother "demonstrated difficulty understanding and meeting her child's developmental and emotional needs[,]" and remained focused on "her own distress and desire for reunification, without fully acknowledging the child's condition or the reasons for removal." Weber recommended ongoing medication monitoring, individual and group therapy, trauma-focused treatment or cognitive behavioral therapy, dialectical behavior therapy, dyadic therapy, and parenting education for special needs children.

Mother's therapist, Cheryl Mims, who had treated her for anxiety since the disposition hearing, testified that Mother had made progress in managing her symptoms. Mims explained that Mother's anxiety was tied to the dependency proceedings and likely

would not further improve until reunification, stating that Mother had reached a point where "it is about as good as she's going to get." Mims stated that Mother no longer met the criteria for treatment through their clinic's outpatient specialty program, although she did not oppose continued therapy as recommended in the psychological evaluation. Mims also acknowledged that their therapy had not addressed the role that Mother's conduct had played in putting W.L. at risk.

Despite Mother's active participation in her case plan, the Department remained concerned over her management of her medications, her understanding of W.L.'s special needs, and her ability to manage and stabilize her ongoing mental health issues. One month prior to the initial six-month review hearing, Mother had voluntarily admitted herself into an inpatient psychiatric hospital. Hospital records attached to the social worker's reports indicated that leading up to her hospitalization, Mother reported "depressive symptoms," "suicidal thoughts," and "escalating substance use." At the hearing, Mother acknowledged that she was not managing her anxiety well and was self-medicating with marijuana and alcohol. The hospital discharged her six days later with diagnoses of depression and anxiety disorder. It also adjusted her anxiety medication and prescribed medication to "decrease alcohol cravings." Mother explained that she had begun experiencing withdrawal symptoms after her psychiatrist reduced her medication dosage, and she became distressed when she learned that the Department was not recommending W.L.'s return at the six-month review. She stated that she did "every single thing" in the case plan "in order to be reunited with [W.L.]," and she felt hopeless that the Department would nonetheless continue to recommend W.L.'s removal from her care. As a result, she used marijuana once and alcohol twice to manage her anxiety, and these are the circumstances that led her to admit herself to the hospital.

The Department noted other concerns, including the social worker's observations that Mother sometimes appeared "manic" and "visibly nervous and shaky." Mother had also sent "incohesive and emotionally reactive" text messages to the social worker,

6

claiming that the social worker and the Department were "racist," and the social worker continued to experience ongoing issues with Mother's lack of insight "into the impact of her mental health on her parenting" and the lack of transparency regarding her prescription medications. Additionally, although the Department had provided Mother with housing referrals since the disposition hearing, Mother had only recently secured a transitional housing unit; after several months, Mother would be expected to search for employment and begin paying rent by the spring of 2026. The social worker testified that she hoped Mother would be able to maintain stability in the new housing arrangement, but it was too soon to assess whether she could do so at that point.

## C.     *The Findings and Orders*

After taking the matter under submission, the juvenile court delivered its ruling on November 3, 2025. The court found by clear and convincing evidence that the Department had provided reasonable services. The court listed numerous examples of the Department's efforts, including frequent and ongoing contact with Mother, coordinating visitations with W.L., connecting Mother with mental health providers, and providing referrals to parenting classes and housing services. The court did not agree with Mother's argument that the Department's refusal to liberalize visitation was a denial of reasonable services, concluding that it was a "reasonable decision" by the Department that Mother was not ready at that time for a "step down" from supervised visitation.

The court found by a preponderance of the evidence that there was a substantial risk of harm in returning W.L. to Mother's care. While it acknowledged Mother's "excellent" and "consistent" efforts, the court also noted that Mother's "progress in addressing the underlying issues, while ongoing, is not where we need it to be for a return." Mother still needed to work on "gaining insight on how her choices impact [W.L.]," and how to meet W.L.'s special needs. According to the court, Mother's "mental health" was the "crux of the issue," and her "lack of insight remain[ed] a major

7

concern." The court referred to its "own observations of [Mother] … in court 11 times over the past 10 months." Mother was "unable to answer questions directly … without going off on tangents," "had a hard time containing herself and being still," exhibited "constant activity and movement," "often talked over others, had a hard time listening," and often provided "slippery" answers in court such that the court was left with "the feeling of not being sure what the actual answer was." The court read extensive portions of the psychological evaluation in which the evaluator noted similar behaviors and concluded that Mother's "ongoing mental health concerns are likely to impair her emotional regulation and judgment, particularly when faced with stress or high pressure situations."

The court did emphasize that Mother's behaviors had improved over the course of the dependency proceedings and encouraged her to continue with therapy and to stay on her path toward reunification with W.L. The court stated that it needed "to see a longer track record of [Mother] showing emotional regulation and emotional stability," as well as "insight and accountability" for the circumstances that led the family to dependency court, to reduce the risk to W.L. The court adopted the Department's recommendation for continued reunification services, including supervised visitation, and set the matter for a 12-month status review hearing in early 2026.

Mother timely appealed.

## II.    DISCUSSION

As noted above, Mother challenges the following findings from the juvenile court: (1) returning W.L. to her care at the six-month review would have created a substantial risk of detriment to W.L.'s safety, protection, or physical or emotional well-being, and (2) the Department provided reasonable reunification services. Mother further argues that at a minimum, the juvenile court should have ordered less restrictive visitation to

8

support her reunification with W.L.  Applying the governing standards of review, we discern no error in the juvenile court's ruling.

## A.      *Legal Principles and Standard of Review*

" 'Dependency proceedings span up to four stages: jurisdiction, disposition, reunification, and permanency.  [Citations.]' " (*In re Z.G.* (2026) 19 Cal.5th 373, 377.) During the reunification stage, "[w]hen a child has been removed from a parent's custody, the court ordinarily must order child welfare services designed to facilitate the reunification of the family." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624 (*Michael G.*).)  "Such services may, depending on the case, include evaluations and assessments, counseling, parent education, substance abuse treatment and testing, and other forms of assistance." (*Ibid.*)  The court must also hold periodic review hearings, ordinarily at six-month intervals, to evaluate the status of reunification efforts and next steps.  (§ 366.21; see also *Michael G.*, *supra*, at p. 625.)

At the six-month review hearing, "after considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of their parent … unless the court finds, by a preponderance of the evidence, that the return of the child to their parent … would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1).) "If the child is not returned to their parent … the court shall determine by clear and convincing evidence whether reasonable services that were designed to aid the parent … in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent." (*Id.*, subd. (e)(8).)

We review these rulings for substantial evidence, construing the evidence in the light most favorable to the prevailing party and "keep[ing] in mind that the purpose of the reunification plan is 'to overcome the problem that led to removal in the first place.' " (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483 [substantial evidence standard for

9

detriment finding]; *In re A.O.* (2025) 111 Cal.App.5th 1048, 1061 [substantial evidence standard for reasonable services finding].) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question … is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

We review the juvenile court's visitation orders for abuse of discretion, applying a " 'very high degree of deference to … the juvenile court.' [Citation.]" (*In re R.M.* (2025) 111 Cal.App.5th 119, 134–135.) "We determine whether the order exceeded the bounds of reason and, in so doing, we cannot substitute our judgment for that of the juvenile court. [Citations.]" (*Id.* at p. 135.)

## B.     *The Juvenile Court's Detriment Finding*

The record is undisputed that, by the time of the six-month review hearing, Mother was actively participating in her case plan. Mother argues that given this active participation and her progress to date, the court's finding of detriment rested "largely on speculative concerns" about her mental health and parenting capacity, rather than evidence of a present risk of harm to W.L.

This argument does not rest on a fair characterization of the evidence. As Mother acknowledges, "a parent's compliance with the case plan is not a guarantee the child will be returned to the parent." (*In re Jacob P.* (2007) 157 Cal.App.4th 819, 830.) The juvenile court must still consider whether the parent eliminated the conditions leading to the child's removal and whether the child would be safe in the parent's custody. (See *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141–1142.) The court may consider a

10

parent's lack of insight when assessing whether a child may be safely returned home, so long as the observation is supported by evidence. (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 865–867.)

Here, the juvenile court's detriment finding rested primarily on Mother's limited insight into the effect of her mental health on her ability to care for W.L., who has special needs and requires ongoing services. Although the juvenile court acknowledged Mother's efforts and improvements, it concluded that Mother had not yet fully addressed the problems that led to W.L.'s removal. The juvenile court's concerns were not speculative; they were grounded in concrete facts that Mother largely did not dispute: W.L. entered the dependency system after Mother experienced a mental health crisis; W.L. was malnourished, underdeveloped, and exhibited signs of profound neglect; and Mother failed to prioritize W.L.'s medical care. As noted earlier, just one month before the original six-month review hearing, Mother again experienced a mental health crisis, voluntarily admitting herself to an inpatient psychiatric hospital for six days after reporting depressive symptoms, suicidal thoughts, and escalating substance use. The record showed that, despite months of therapy, Mother continued to struggle with anxiety and depression and had self-medicated with marijuana and alcohol. Although Mother showed growth in admitting herself to a hospital, she largely attributed the hospitalization to external circumstances, including medication changes and the Department's recommendation against W.L.'s return, rather than showing accountability regarding her ongoing mental health instability and acknowledging how it could affect her ability to meet W.L.'s daily needs.

The juvenile court's finding also relied on Mother's psychological evaluation, the social worker's observations, and its own observations of Mother in court, all of which reflected continuing emotional instability and a limited understanding of the impact of her mental health on her parenting. On the present record, it was reasonable for the juvenile court to conclude that Mother had not yet sufficiently ameliorated the

11

circumstances that led to W.L.'s removal and that returning W.L. to Mother's care at the six-month review hearing would create a substantial risk of detriment to W.L.[3]

Mother repeatedly points to selected evidence that she believes is favorable to her: e.g., her therapist Cheryl Mims's testimony, Mother's acknowledgment of her errors leading to W.L.'s removal, and her positive visits with W.L. In essence, this is an invitation for us to reweigh the evidence, something that we cannot do on appeal. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Under the substantial evidence standard of review, we do not inquire whether the evidence could potentially support a finding that is contrary to the finding made by the juvenile court; rather, we review whether the record contains evidence, *contradicted or not*, that supports the finding that was made. (*Adoption of A.B.* (2016) 2 Cal.App.5th 912, 925; *In re M.D.* (2023) 93 Cal.App.5th 836, 857 [we " 'affirm the order even if there is other evidence supporting a contrary finding.' [Citation.]"].) For the reasons already stated, we conclude that it does.

## C.     *The Juvenile Court's Reasonable Services Finding*

Mother goes on to argue that because she was limited to supervised visits with W.L. during this review period, the Department failed to show, by clear and convincing evidence, that it provided reasonable reunification services.

"Reunification services need not be perfect. [Citation.] But they should be tailored to the specific needs of the particular family." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972.) The Department provides reasonable services when it "identif[ies] the problems leading to the loss of custody, offer[s] services designed to remedy those problems, maintain[s] reasonable contact with the parents," and makes

---

[3] Mother argues that the juvenile court could have returned W.L. to her care under a family maintenance plan, and that the availability of that option "confirms that continued removal was not required." Mother's argument rests on the faulty premise that W.L. could be safely returned to her care, even with ongoing services. The juvenile court specifically rejected that premise.

"reasonable efforts to assist the parents in areas where compliance proved difficult."
(*In re Riva M.* (1991) 235 Cal.App.3d 403, 414, italics omitted.)

Mother does not dispute the juvenile court's finding that the Department maintained consistent contact with her, coordinated her visits with W.L., set up child and family team meetings, connected her with providers and resources to address her mental health, and provided her with referrals to support her housing needs. Instead, her position is that the Department's refusal to permit unsupervised visitation, standing alone, rendered the services unreasonable.

There is no doubt that visitation is an essential component of reunification services. (*In re A.O.*, *supra*, 111 Cal.App.5th at p. 1062.) Section 362.1, subdivision (a) requires that "any order placing a child in foster care, and ordering reunification services, shall provide ... [¶] ... for visitation between the parent ... and the child." (*Id.*, subd. (a)(1)(A).) "Visitation shall be as frequent as possible, consistent with the well-being of the child." (*Ibid.*) Nevertheless, Mother cites no authority, and we are aware of none, holding that the Department's refusal to "step down" visitation to accommodate a parent's subjective belief that she is ready for unsupervised visits renders reunification services unreasonable. Indeed, the law is settled that " 'a parent's liberty interest in the care, custody and companionship of children cannot be maintained at the expense of their well-being.' [Citation.]" (*In re A.O.*, *supra*, at p. 1062.) Thus, " '[w]hile visitation is a key element of reunification, the court must focus on the best interests of the children "and on the elimination of conditions" ' " that led to dependency proceedings. (*Ibid.*)

In this case, the record contains substantial evidence that the Department made reasonable efforts to arrange and facilitate visitation between Mother and W.L. in a manner consistent with W.L.'s safety and well-being. Contrary to Mother's claim, the record shows that, although her visits remained supervised, the Department liberalized visitation by moving them to a less restrictive location, giving Mother greater freedom to interact with W.L. By the time of the six-month review hearing, the evidence showed

13

that Mother, while being on "the path" towards reunification with W.L., had not yet progressed to the point where unsupervised visitation was considered appropriate. As noted, substantial evidence supported both the Department's and the juvenile court's concerns that Mother's ongoing mental health issues continued to affect her ability to provide W.L. with a safe and stable environment. The social worker expressly pointed out that the supervised visits had gone well "because the visits are observed, structured, and have a safe play environment." On this record, the Department did not act unreasonably in declining to move to unsupervised visitation at this stage of the proceedings. Liberalized but still supervised visitation, standing alone, did not render the reunification services unreasonable.

Mother's reliance on *Tracy J. v. Superior Court (*2012) 202 Cal.App.4th 1415, 1419 (*Tracy J.*), is misplaced. In *Tracy J.*, over the course of 12 months, the parents—who were developmentally disabled—had not been informed about their child's medical appointments in advance, did not receive any instruction on how to recognize their child's special needs, were not referred to the requisite parenting programs, and were not offered services designed to address the mother's specific physical disabilities. (*Id*. at pp. 1419–1420, 1427–1428.) There, the limitations on the parents' visits were based primarily on the fact that they were disabled without any evidence that their behavior had jeopardized or would jeopardize the child's safety. (*Id*. at p. 1427.) Here, by contrast, Mother does not dispute that the Department provided her with reasonable resources to address the issues that led to W.L.'s dependency. Furthermore, unlike in *Tracy J.,* the limitation on Mother's visitation was directly based on the determination that she continued to pose a risk to W.L.'s safety, not based solely on any untreated disability.

We conclude that the juvenile court's reasonable services finding was supported by substantial evidence.

14

**D.      *The Juvenile Court's Discretion to Continue Supervised Visitation***

As a final alternative, Mother argues that the juvenile court abused its discretion in denying her request for unsupervised visits, given that she had made significant progress. She points to the evidence that her recent visits with W.L. had been appropriate and positive, as well as evidence that she completed her parenting classes, maintained regular drug testing, consistently participated in therapy, and secured housing.

Again, Mother's argument appears to be another invitation to ignore the standard of review and reweigh the evidence. " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the [juvenile] court." ' [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.) On the present record, the juvenile court acted within its discretion in maintaining supervised visits. As stated above, its decision was supported by substantial evidence and did not exceed the bounds of reason.

We recognize Mother's efforts and commitment to W.L., and we echo the juvenile court's hope that she continues to make progress towards reunification. At the same time, the dependency scheme requires that the juvenile court place the child's safety and well-being at the forefront of its considerations.

### III.      DISPOSITION

The juvenile court's November 3, 2025 findings and orders from the six-month review hearing are affirmed.

_____
                                    CHUNG, J.*


WE CONCUR:




_____
GREENWOOD, P. J.




_____
DANNER, J.




_In re W.L.; Santa Clara County DFCS v. K.L._
H053832

_____
        * Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.